## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CLOUD TANK INC., | ) |
| Plaintiff, | ) |
| | )      C.A. No. 26-136-JLH |
| v. | ) |
| | ) |
| INTEL CORPORATION, | )      **PUBLIC VERSION** |
| Defendant. | )      **FILED: May 4, 2026** |
| | ) |
| | ) |
| | ) |
| | ) |

## <u>PLAINTIFF CLOUD TANK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

OF COUNSEL:

Jonathan R. Spivey (*pro hac vice*)
Aaron M. Levine (*pro hac vice*)
Matt Todd (*pro hac vice*)
POLSINELLI PC
1000 Louisiana St, Suite 6400
Houston, TX 77002
Tel: (713) 374-1600
jspivey@polsinelli.com
alevine@polsinelli.com
mtodd@polsinelli.com

Stephen J. Kraftschik (#5623)
POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Tel: (302) 252-0920
skraftschik@polsinelli.com

*Attorneys for Plaintiff Cloud Tank, Inc.*

i

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF THE ARGUMENT............................................. 1

II. FACTS ....................................................................................................................... 1

    A. The First Amended Complaint.............................................................................. 1

    B. Intel's Agreements with SDG Logic and Cloud Tank....................................... 2

        1. Cloud Tank's View of the Intel Agreements. ............................................. 2

        2. Intel Misinterprets the SDG Logic and Cloud Tank Agreements. ............... 5

III. NATURE OF THE PROCEEDINGS .......................................................................... 6

IV. LEGAL STANDARD................................................................................................. 6

V. ARGUMENT .............................................................................................................. 7

    A. Cloud Tank's Claims Were Not "Fabricated" By Omitting Irrelevant Agreements. ......... 7

    B. ████████ the ARCA Does Not Apply to Cloud Tank's Trade Secrets. ..................... 8

        1. ████████ the ARCA is Limited to Software Addendums and Company Deliverables. ............................................................................................................. 8

        2. Neither the Software Addendum Nor the Company Deliverables Under the Two SOWs Support Intel's License Claim................................................................. 9

        3. The 2023 and 2025 Vulnerabilities Represent ████████████████ ████ and Are Not Licensed to Intel. .................................................................. 10

        4. Intel's Motion Assumes as a Factual Matter that the 2023 and 2025 Vulnerabilities are ██████████████████████████████████████........................................ 11

    C. The M-RUNDA Does Not Apply to the 2023 and 2025 Vulnerabilities. ................. 12

        1. None of the Parties Intended the M-RUNDA to Apply to Cloud Tank. ...................... 12

        2. The "Purpose" of the M-RUNDA was the Consulting Agreement. ............................. 13

        3. The M-RUNDA Only Applies to the Specific Code SDG Logic was Granted Access to, Not All Intel Code and Not Code Implicated by the 2023 and 2025 Vulnerabilities...... 14

        4. Cloud Tank is not an "Affiliate" of SDG Logic Under the M-RUNDA. ..................... 14

        5. Intel Inappropriately Assumes Cloud Tank is an Affiliate. ........................................ 15

D.   Cloud Tank Sufficiently Pled a Cause of Action for Misappropriation. ........................... 16

E.   Cloud Tank Sufficiently Pled Breach of Contract. ........................................................... 18

F.   Remaining Claims Not Preempted by Delaware's Uniform Trade Secret Act. ............... 19

   1.   Delaware Rejects a Label-Based Rule to Displacement............................................. 19

   2.   Ruling on Displacement is Premature at the Pleadings Stage. ................................... 20

VI.   CONCLUSION................................................................................................................. 20

110701995.14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Glob. Servs. GmbH v. Guidewire Software, Inc.*,
631 F.Supp.2d 504 (D. Del. 2009)........................................................................20

*Apple Inc. v. Correllium, Inc.*,
No. 21-12835, 2023 WL 3295671 (11th Cir., May 8, 2023).................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................6

*Beard Rsch., Inc. v. Kates*,
8 A.3d 573 (Del. Ch. 2010)..................................................................................19

*Bell Atlantic Corp v. Twombly*,
550 U.S. 544 (2007)................................................................................................6

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).................................................................................7

*Connelly v. Lane Constr. Corp.*,
809 F.3d 780 (3d Cir. 2016)............................................................................17, 19

*Data Dimension, LLC. v. Golino*,
No. 6:17-CV-951-Orl-40KRS, 2018 WL 1305886 (M.D. Fla., Mar. 13, 2018) ...............11, 12

*Disruptive Res., LLC v. Ballistic Barrier Prods. Inc.*,
2025 WL 2879447 (D. Del. Oct. 9, 2025) .......................................................16, 17

*Ethypharm S.A. France v. Bentley Pharms., Inc.*,
388 F. Supp.2d 426 (Del. Del. 2005).....................................................................20

*Hemostemix, Inc. v. Accudata Sols.*,
No. 20-881-RGA, 2021 WL 1198137 (D. Del. March 30, 2021)...........................20

*Insulet Corp. v. EO Flow, Co. Ltd.*,
104 F.4th 873 (Fed. Cir. 2024) .............................................................................17

*Jackson v. NuVasive, Inc.*,
2022 WL 610704 (D. Del., February 11, 2022)..................................................8, 19

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
964 F.2d 965 (9th Cir. 1992) ................................................................................12

110701995.14

*Moon Express, Inc. v. Intuitive Machs., LLC*,
No. 16-344-LPS-CJB, 2017 WL 4217335 (D. Del., September 22, 2017) ............................19

*Moretti v. Hertz Corp.*,
No. 14-469-LPS, 2017 WL 1032783 (D. Del., March 17, 2017) ...............................................8

*Oakwood Labs. LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021)............................................................................................16, 18

*Osborn v. Kemp*,
991 A.2d 1153 (Del. 2010) ....................................................................................................10

*OverDrive, Inc. v. Baker & Taylor, Inc.*,
No. 5835-CC, 2011 WL 2448209 (Del. Ch., June 17, 2011) .................................................20

*Panacea Fin. v. Tallied Techs., Inc.*,
2025 U.S. Dist. LEXIS 188269 (N.D. Cal. Sept. 24, 2025) ...................................................20

*Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics*,
Case No. 2:19-cv-893-RJC, 2020 WL 2085251 (W.D. Pa. Apr. 30, 2020) ...........................11

*Schmidt v. Skolas*,
770 F.3d 241 (3d. Cir. 2014)....................................................................................................7

*Sheridan v. NGK Metals Corp.*,
609 F.3d 239 (3d Cir. 2010)......................................................................................................6

*In re Shorenstein Hays-Nederlander Theatres LLC Appeals*,
213 A.3d 39 (Del. June 20, 2019) ..........................................................................................15

*SI Handling Sys., Inc. v. Heisley*,
753 F.2d 1244 (3d Cir. 1985)..................................................................................................17

*SI Mgmt. L.P. v. Wininger*,
707 A.2d. 37 (Del. 1998) ..................................................................................................15, 16

*SI03, Inc. v. Musclegen Res., Inc.*,
2020 WL 2468412 (E.D. Mo., May 13, 2020) .......................................................................16

*Vault Corp. v. Quaid Software Ltd.*,
847 F.2d. 255 (5th Cir. 1988) .................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 12 ....................................................................................................................16

Fed. R. Civ. P. 12 (b)(6)......................................................................................................6, 16

# I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendant Intel does not deny that Plaintiff Cloud Tank discovered and developed the 2023 and 2025 Vulnerabilities, which represent Cloud Tank's pioneering trade secrets. Intel does not deny that Cloud Tank disclosed its trade secrets pursuant to the Intel-Cloud Tank CNDA. Further, Intel does not deny misappropriating Cloud Tank's trade secrets and using them for Intel's commercial purposes. *See generally* D.I. 41. To avoid liability, Intel seeks to misinterpret the scope, hierarchy, or legal applicability of specific clauses in Intel's Amended and Restated Collaboration Agreement ("ARCA") to claim ownership of Cloud Tank's trade secrets. *See id.* at 1-2, 5-8. Intel also does the same with its M-RUNDA with SDG Logic. *See id.* at 8-9. Contrary to Intel's assertion, the ARCA does not apply to Cloud Tank's trade secrets, which are neither licensed to nor owned by Intel, and the Intel-SDG Logic M-RUNDA never applied to Cloud Tank.

Intel also argues for dismissal for failure to properly plead claims for trade secret misappropriation and breach of contract. *Id.* at 15-18. As detailed below, Cloud Tank's pleading is legally sufficient. Intel also argues that Cloud Tank's common law claims for conversion, unjust enrichment and tortious interference are displaced by Cloud Tank's DUTSA claim. *Id.* at 19-20. However, displacement requires a detailed analysis of the factual allegations and is often deferred until a further record can be established during discovery.

For these and the reasons set forth below, Intel's motion to dismiss Cloud Tank's First Amended Complaint (hereinafter the "FAC"), should be denied.

# II. FACTS

## A. The First Amended Complaint.

The FAC alleges trade secret misappropriation under the Federal DTSA, Delaware's DUTSA, Breach of Contract, Unjust Enrichment, Conversion, and Tortious Interference. FAC ¶¶75-114. These allegations arise out of Intel's unauthorized and unlicensed exploitation of

1

███████████████████████████ discovered by Cloud Tank in Intel processors and ███████████████ developed by Cloud Tank and implemented by Cloud Tank in its Secureware™ software. *Id.*, ¶¶49, 52, 64. Cloud Tank's trade secrets were discovered and developed with its proprietary tools and techniques, not through reviewing "Intel's microcode," as Intel wants the Court to believe. *Id.*, ¶¶21-22. ████████████████████████████████████████████████████████████████████████████ *Id.*, ¶55. Intel ██████████████████████ with Cloud Tank despite having decided to misappropriate Cloud Tank's trade secrets and exploit them for itself without authorization or compensation. *Id.*, ¶¶71-74.

**B.      Intel's Agreements with SDG Logic and Cloud Tank.**

**1.      Cloud Tank's View of the Intel Agreements.**

Intel executed at least nine separate agreements with either SDG Logic or with Plaintiff Cloud Tank. The parties differ in how these agreements should be interpreted and applied. Cloud Tank's viewpoint is depicted below.  As it did with both SDG Logic and Cloud Tank, Intel first  enters a CNDA with any counterparty for which it seeks to engage in discussions.

███████████████████████████ The CNDA form does not specify any particular transactional purpose; it establishes rules for the safe exchange of confidential information without granting

either party rights to the other's intellectual property. *Id.*, at §8.2 ███████████ The CNDAs act as umbrella agreements between the respective parties.

The Intel-SDG Logic CNDA is the first agreement between Intel and SDG Logic bearing ████████████████████ D.I. 41, Ex. A, Header. The Consulting Agreement was executed on October 5, 2018, and the M-RUNDA followed shortly thereafter October 17, 2018, bearing ████ ████████████████ *Id.*, *see also* D.I. 41, Ex. B, Header. These agreements are inseparable and should be interpreted together to understand the true intent of the parties. The Consulting Agreement was established to enable SDG Logic ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ The Consulting Agreement references the Intel-SDG Logic CNDA by serial number because it existed at the time.

The M-RUNDA is not referenced in the Consulting Agreement by serial number, because it did not yet exist. *See generally* D.I. 41, Ex. A. The M-RUNDA granted broad license rights to Intel but only with respect to the "Confidential Information" disclosed to SDG Logic under its auspices. D.I. 41, Ex. B, §§ 1.3, 2.1, 2.2. Otherwise, the M-RUNDA expressly reserves intellectual property rights outside of its scope. *Id.*, § 2.9, § 6. The M-RUNDA is also limited to its "Purpose," which ████████████████████████████████████████████████████████████ *Id.* at § 1.5, § 2.1. The sole "[p]urpose" of the M-RUNDA was to facilitate the parties' Consulting Agreement relationship. *Id.*

The license rights granted by the M-RUNDA were limited to ████████████ specified by Intel for which SDG Logic was retained to implement pursuant to the terms of the Consulting Agreement. D.I. 41, Ex. A, Addendum C, §§ 5.1.2.1, 5.2.2.1, 5.3.2.1. ██████████████

3

███████████████████████████████████████████ and neither the Consulting Agreement nor the M-RUNDA were ever referenced again.

In late 2019, Intel and SDG Logic negotiated and entered into the original Collaboration Agreement. *See* D.I. 41, Ex. C at 1 █████████████████████████████████████ ████████████████████████████████████████████████████████ Under that agreement, SDG Logic would assist Intel in designing security hardened processors for sensitive applications based on Intel's █████████████████████████████████████ ██████████████████████████████████ However, Intel determined that its customers would not pay extra for security-enhanced chips and the Collaboration Agreement never progressed.

Mr. Ghetie, three years later in 2021, established Cloud Tank to provide a broad array of security services, including software. FAC ¶¶4, 16. Intel entered a CNDA with Cloud Tank in 2021, ████████████████████████ Intel and Cloud Tank negotiated the ARCA along with a Master Supply Agreement ("MSA"). D.I. 41, Exs. C, D. Based on the agreements, Cloud Tank would license its previously developed ████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████ The ARCA specifically references the Intel-Cloud Tank CNDA by serial number and incorporates its terms, but neither references nor incorporates the Intel-SDG Logic CNDA or the Intel-SDG Logic M-RUNDA. *See* D.I. 41, Ex. C, § 1.6, § 9.1; Ex. D, § 11.

The ARCA also carefully distributes intellectual property rights through definitions and provisions for █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ License and

110701995.14

ownership rights in each category are tied to concrete items such as ███████████

███████████████████████████████████████████ The ARCA included

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ relate in

any way to Cloud Tank's later discovered trade secrets. FAC ¶¶71, 72, 80.

### 2. Intel Misinterprets the SDG Logic and Cloud Tank Agreements.

Intel not only misinterprets but also attempts to re-write clauses of the agreements to justify

its misconduct. Intel asserts that the Intel-SDG Logic M-RUNDA acts an umbrella agreement

along with the Intel-SDG Logic CNDA and together they govern Intel's relationship with Cloud

Tank as depicted below. Intel's assertion is belied by the contract language when interpreted to

enforce the parties' objective intent at the time of the agreement and by the parties' course of contracting conduct. For example, Intel's logic loses traction because it would have been superfluous to have a

CNDA with Cloud Tank ███████████████████████████████

███████ *See* D.I. 41, Ex. B, § 1.1; *compare with* FAC, Ex. C § 1.1. Moreover, Intel did not

demand Cloud Tank execute a M-RUNDA because the parties' relationship did not require one

and neither party contemplated the existing M-RUNDA applying to Cloud Tank. Indeed, the

ARCA provides ████████████████████████████████████████████ D.I. 41, Ex. C, § 9.1. Conversely, accepting Intel's contrived position means that Intel executed an unnecessary CNDA and failed to follow its own practice of citing serial numbers of applicable confidential agreements.

## III.    NATURE OF THE PROCEEDINGS

The operative pleading is Cloud Tank's FAC. D.I. 15. Cloud Tank amended its Complaint prior to any substantive filing by Intel. Intel filed its Motion to Dismiss pursuant to Rule 12(b)(6), which Cloud Tank opposes. D.I. 40.

## IV.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must only contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The plausibility standard "does not impose a probability requirement." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 556 (2007). The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Under *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

110701995.14

## V. ARGUMENT

### A. Cloud Tank's Claims Were Not "Fabricated" By Omitting Irrelevant Agreements.

Intel includes agreements not incorporated into or integral to Cloud Tank's FAC as part of its motion to dismiss, principally the ARCA between Intel and Cloud Tank, the M-RUNDA agreement between Intel and SDG Logic, and ███████████████[1]. Intel posits that these agreements govern Cloud Tank's trade secrets. The weight of the facts are against Intel because the provisions of these agreements were never contemplated to have any application to Cloud Tank's independently develop trade secrets.[2] Further, despite going beyond the pleadings, Intel has not requested that the Court transform its 12(b)(6) motion into one for summary judgment. *See, e.g.,* D.I. 41 at 2. Rather, Intel justifies this procedural move by arguing that Cloud Tank somehow "fabricated" its causes of action and concealed from the Court the various other agreements that Intel asserts govern the disclosure of the Cloud Tank's trade secrets to Intel. D.I. 41 at 10-11. Contrary to Intel's assertion, the CNDA is the only relevant and applicable agreement between Intel and Cloud Tank related to Cloud Tank's claims. FAC at Exs. A, C. Yet, Cloud Tank, as plaintiff, "need not anticipate or overcome affirmative defenses" in its own Complaint. *See e.g., Schmidt v. Skolas*, 770 F.3d 241, 248-252 (3d. Cir. 2014) (reversing dismissal in part as plaintiff was not required to plead around tolling/discovery rule issues not on the complaint's face); *see*

---

[1] Intel's interpretation of ████████████████████████████████████████

[2] Thus, these agreements, as well as Intel's other Exhibits, are not "integral to or explicitly relied upon" in the FAC and thus should not be considered in ruling on Intel's Motion. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.").

110701995.14

*also Moretti v. Hertz Corp.*, No. 14-469-LPS, 2017 WL 1032783, at *4 (D. Del., March 17, 2017) (denying motion for judgment on pleadings).

**B.** ██████████ **the ARCA Does Not Apply to Cloud Tank's Trade Secrets.**

Intel's primary argument is ██████████ the ARCA grants Intel ownership over Cloud Tank's trade secrets. Yet, ARCA ████ does not apply to Cloud Tank's trade secrets, and to the extent the ARCA did arguably cover Cloud Tank's trade secrets, which it does not, Cloud Tank's trade secrets are ████████████████████████████ because they were developed independently by Cloud Tank. FAC ¶¶21-23; D.I. 41, Ex. C, § 1.8. Further, Intel's motion argues that Cloud Tank's trade secrets represent ████████████████████████████ ████████████████████████ to the ARCA. D.I. 41 at 7, 11-13. Such factual determinations are inappropriate for a motion to dismiss. *See e.g. Jackson v. NuVasive, Inc.*, 2022 WL 610704 at *6 (D. Del., February 11, 2022) (holding court "cannot resolve this issue on a motion to dismiss [because] [t]here are factual disputes . . . .").

**1.** ██████████ **the ARCA is Limited to Software Addendums and Company Deliverables.**

Intel points to portions of ARCA ████ while overlooking language that limits its applicability. ████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████ Importantly, Intel's briefing engages in slight-of-hand to rewrite ████████████████████████████████████ D.I. 41 at 11. "Intel microcode" is undefined and apparently means whatever Intel needs it to mean. ████████

████████████████████████████████████████████████

8

[black redaction bar]

[black redaction bar]

[black redaction bar]

[black redaction bar]

[black redaction bar]

[black redaction bar]

Moreover, [black redaction] cannot be disregarded because it provides important context and limits on rights [black redaction]

[black redaction block]

[black redaction bar]

[black redaction bar]

[black redaction bar]

[black redaction] The 2023 and 2025 Vulnerabilities represent none of these things. No such [black redaction] exists and Intel neglected to tell the Court that fact.

### 2. Neither the Software Addendum Nor the Company Deliverables Under the Two SOWs Support Intel's License Claim.

The [black redaction] of the ARCA was limited to specific Intel products [black redaction] [black redaction] D.I. 41, Ex. C at Ex. E. As pled in the FAC, a different and much broader set of products are implicated by the 2023 or 2025 Vulnerabilities. FAC ¶¶45, 60. Further,

[black redaction bar]

[black redaction bar]

110701995.14

████████████████████████████████████████████████████████

████████████ .

The ARCA was also associated with ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Again, a different and

broader set of products are implicated by the 2023 and 2025 Vulnerabilities. FAC ¶¶45, 60.

**3. The 2023 and 2025 Vulnerabilities Represent ████████████ ████████████ and Are Not Licensed to Intel.**

If anything, Cloud Tank's trade secret 2023 and 2025 Vulnerabilities qualify as ████

████████████████████ The ARCA defines ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ [3] D.I. 41, Ex. C, § 1.8

(emphasis added). As pled in the FAC, Cloud Tank discovered the 2023 and 2025 Vulnerabilities

independently through experimental techniques and not based upon ████████████ FAC

¶¶21-22, 45, 60. Essentially, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[3] *Osborn ex erl. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) (reaffirming that contracts are to be read as a whole giving each provision effect and avoiding readings that render terms meaningless or illusory).

10

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

####     4.     Intel's Motion Assumes as a Factual Matter that the 2023 and 2025 Vulnerabilities are ■■■■■■■■■■■■■■

Separately, Intel's motion simply assumes as a factual matter that some or all of the 2023 and 2025 Vulnerabilities represent ■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■ of the ARCA. D.I. 41 at 7, 11-13. Fundamentally, answering questions whether software represents a derivative work requires many fact determinations and simply is not the appropriate subject of a motion to dismiss. *Data Dimension, LLC. v. Golino*, No. 6:17-CV-951-Orl-40KRS, 2018 WL 1305886, at \*2-4 (M.D. Fla., Mar. 13, 2018) (denying 12(b)(6) motion to dismiss counterclaims because of fact specific inquiries of derivative work analysis); *Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics*, Case No. 2:19-cv-893-RJC, 2020 WL 2085251, at \*4 (W.D. Pa. Apr. 30, 2020) (Plaintiff alleged router software/protocols were unlawful copies or unlawful derivative works and Court denied motion to dismiss because dismissal "would require more specific information than that which is currently before the court.")

Additionally, the ■■■■■■■■■■■■■■■■■■■■■■■■■■■■ are observations discovered experimentally. FAC ¶¶21-22, 45, 60. An observation concerning ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■ any more than a critic's review of a play or a film. ■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

110701995.14

██████████████████████████████████████████████.[4] ████████████████████████████████████

████████████████████████████████████████████████████████ at minimum, the incorporation of protected elements of the original in some concrete form. *See e.g. Vault Corp. v. Quaid Software Ltd.*, 847 F.2d. 255, 267-68 (5th Cir. 1988); *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 968-69 (9th Cir. 1992); *Apple Inc. v. Correllium, Inc.,* No. 21-12835, 2023 WL 3295671, at *13 (11th Cir., May 8, 2023) ("Apple doesn't have a monopoly over transformative research tools that supply information about its operating system. That doesn't fall within its derivative market."); *Data Dimensions*, 2018 WL 1305886 at *2-3 (explaining "a derivative work must incorporate a substantial element of a preexisting work" and explaining copyright does not "extend to any idea, procedure, process, system or method of operation") (internal cites omitted).

Likely recognizing that its ████████████ argument has significant infirmities, Intel argues that the FAC "confirm[s]" that Cloud Tank's Secureware™ software modifies the Intel processor firmware. D.I. 41 at 13, *citing* FAC ¶5. This completely misreads what is stated in the FAC. Paragraph 5 states nearly the *opposite* of what Intel alleges, as Secureware™ "can be installed on existing hardware and *without recompilation of existing software applications by updating the firmware*". FAC ¶5 (emphasis added). In other words, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

### C. The M-RUNDA Does Not Apply to the 2023 and 2025 Vulnerabilities.

#### 1. None of the Parties Intended the M-RUNDA to Apply to Cloud Tank.

---

[4] Importantly, the ████████████████████████████ does not contain any of the 2023 or 2025 Vulnerabilities.

The Intel-SDG Logic M-RUNDA of 2018 simply does not apply to Cloud Tank's disclosure of the 2023 and 2025 Vulnerabilities to Intel. Indeed, until this litigation was first threatened, Intel never believed the M-RUNDA operated as an umbrella agreement between Intel and Cloud Tank. This can plainly be seen in the ARCA itself. While Intel's other agreements reference applicable CNDAs by serial number, the ARCA somehow forgot the existence and applicability of the serialized Intel-SDG Logic M-RUNDA (and CNDA). Moreover, ███████ the ARCA states ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ The pre-litigation behavior of Intel is inconsistent with its current stance. If the M-RUNDA applied to Cloud Tank (or if the work contemplated required a M-RUNDA at all), one would expect Section 9 to be written very differently.[5]

### 2. The "Purpose" of the M-RUNDA was the Consulting Agreement.

Turning to the text of the M-RUNDA itself, Intel's interpretation of the M-RUNDA is unreasonably broad. First, the M-RUNDA was limited to a "Purpose," ██████████████

████████████████████████████████████████████ in other words Intel and SDG Logic. D.I. 41, Ex. B, § 1.5. When the M-RUNDA was executed, it was to support the very limited Consulting Agreement. D.I. 41, Ex. A, Addendum C. The SDG Logic Consulting Agreement provided for █████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[5] If a M-RUNDA was required for access to certain Intel information, as Jones Dec., Ex. A (an email from 2018 regarding the SDG Logic Consulting Agreement) implies, it calls into question whether Intel followed its policies and procedures with Cloud Tank, but even if Intel failed to follow its policies, that would not justify Intel's misappropriations.

110701995.14

Moreover, the M-RUNDA also makes clear that SDG Logic was not granting Intel a license to everything and anything it might conceive. D.I. 41, Ex. B, §§ 2.9, 6. Even ██████ which Intel relies upon heavily, states: ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ The mitigation strategies disclosed to Intel represented how Secureware™ dealt with ████████████████████████████████ FAC ¶¶49, 52, 64.

**3. The M-RUNDA Only Applies to the Specific Code SDG Logic was Granted Access to, Not All Intel Code and Not Code Implicated by the 2023 and 2025 Vulnerabilities.**

Further, the M-RUNDA only applies to ████████████████ to the microcode that was disclosed to SDG Logic pursuant to the M-RUNDA. D.I. 41, Ex. B, § 2.9 ████████████

████████████████████████████ § 1.3. While Intel consistently frames everything amorphously as "Intel microcode," it is important to understand there is no single-unified Intel microcode, rather, the microcode is divided into different domains based on product families (FAC ¶¶71-72), and functionality (FAC ¶¶46, 47). The microcode domains disclosed to SDG Logic pursuant to the M-RUNDA were limited. The 2023 and 2025 Vulnerabilities were not only discovered experimentally (FAC ¶¶6, 7, 16, 21-22, 45, 60), but most of the 2023 and 2025 Vulnerabilities implicate ████████████████████████████████ that neither SDG Logic nor Cloud Tank was ever granted access to. FAC ¶¶45-48, 50-51, 61-64. Accordingly, Intel cannot show as a factual matter (and does not attempt to do so) that every trade secret within the 2023 and 2025 Vulnerabilities ████████████████████████ to the specific code that SDG Logic was granted access.

**4. Cloud Tank is not an "Affiliate" of SDG Logic Under the M-RUNDA.**

110701995.14

The M-RUNDA applies to ███████████████████████████████
███████████ D.I. 41, Ex. B, Preamble. "Affiliates" has a very specific definition that relies exclusively on the present tense. *Id.* at § 1.1. This is in contrast with the ARCA, that expressly captures future entities within the definition of "Affiliate."

| Intel-SDG M-RUNDA §1.1 (D.I. 41, Ex. B) | Intel-Cloud Tank ARCA §1.1 (D.I. 41, Ex. C) |
|---|---|
| ████████████████████████ ████████ | ████████████████████████ ████████ |

D.I. 41, Ex. B § 1.1; D.I. 41, Ex. C § 1.1 (emphasis added). The difference in agreement language leads to the sound conclusion that the parties knew how to include "future" Affiliate language, if the parties wanted the M-RUNDA to apply to Affiliates created in the future. Under Delaware Law, the use of differing language indicates differing meanings. *See e.g., In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 51 (Del. June 20, 2019) (noting the LLC agreement used different terms, which suggested different meanings). Intel acknowledges that Cloud Tank did not exist in 2018 and would not exist until 2021. D.I. 41 at 4-5; FAC ¶4.

Consequently, because Cloud Tank did not exist at the time of the M-RUNDA (or during the performance of the Consulting Agreement the M-RUNDA was intended to support), Cloud Tank is excluded from the M-RUNDA's definition of Affiliate. At worst, these agreements reveal an ambiguity in the M-RUNDA's affiliate clause. Here, any such ambiguity should be construed against Intel, as the drafter of a take-it-or-leave-it form agreement. *See e.g., SI Mgmt. L.P. v. Wininger*, 707 A.2d. 37, 42-43 (Del. 1998) (construing ambiguity against the drafter).

### 5. Intel Inappropriately Assumes Cloud Tank is an Affiliate.

Finally, the "Affiliate" language of the M-RUNDA establishes a very specific factual test. Only those ███████████████████████████████████████ with Intel or SDG Logic

qualify as an Affiliate. D.I. 41, Ex. B, § 1.1. ███████████████████████

███████████████████████████████████████████████

██████████████████████" *Id.* Intel's brief incorrectly assumes that "on its face" the

M-RUNDA makes Cloud Tank an Affiliate (D.I. 41 at 8), but Intel provides no factual basis for

this assumption, which is inappropriate for a Rule 12 motion. *See e.g.*, *SI03, Inc. v. Musclegen*

*Res., Inc.*, 2020 WL 2468412, at * 3 (E.D. Mo., May 13, 2020) (denying defendant's Rule 12(b)(6)

motion in part because "Court would have to accept as true Defendant's [factual] assertion" and

"Defendant has not made such a showing" making the issue inappropriate for a motion to dismiss).

### D. Cloud Tank Sufficiently Pled a Cause of Action for Misappropriation.

Cloud Tank sufficiently pled that both ████████████████████████

████████████████████████████████████████ were not

readily ascertainable by proper means and derived independent economic value from "their

confidential nature," or not being generally known. *See, e.g.,* FAC ¶¶5-7, 16-27, 76-79.

Specifically, the FAC alleges that █████████████████████████

█████████████████████████████████████████

████████████████████████ and derived economic value from

the secrecy of both. *Id.* That is sufficient at the pleading stage. *Oakwood Labs. LLC v. Thanoo*,

999 F.3d 892, 904 (3d Cir. 2021); *see also Disruptive Res., LLC v. Ballistic Barrier Prods. Inc.*,

2025 WL 2879447, at *13 (D. Del. Oct. 9, 2025).

*First,* Intel argues Cloud Tank's trade secrets were readily ascertainable because Intel had

access to its own microcode and because Cloud Tank failed to allege "Intel could not have

independently ascertained the alleged vulnerabilities or developed the corresponding mitigations

within its own code." D.I. 41 at 15-16. But access to an underlying product or code does not mean

concealed vulnerabilities or defects are *per se* readily ascertainable—"proper access," is not the

test. Intel's reliance on *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244 (3d Cir. 1985), is misplaced because the "ease or difficulty" quoted by Intel reflects only one of six factors considered in determining whether information is a trade secret under "the trade secrets law of Pennsylvania." *Id*. at 1255-56. Intel also overstates the holding in *Insulet Corp. v. EO Flow, Co. Ltd.*, 104 F.4th 873 (Fed. Cir. 2024), where the Federal Circuit simply held, under a preliminary injunction standard, that "[i]t was an error for the district court not to consider . . . whether the alleged trade secrets would have been capable of being obtained through reverse engineering." *Id*. at 882.

Moreover, Intel admits that it could not implement Cloud Tank's mitigation strategies without using Cloud Tank's identification trade secrets. *See* D.I. 41 at 14 ("Intel could not implement those microcode mitigations … without using the underlying vulnerability information."). At the pleading stage, the Court assesses plausibility, not whether the plaintiff will ultimately prove its claims. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016). Cloud Tank has met its burden of placing Intel on notice and has sufficiently pled the identified trade secrets are not know or readily ascertainable and that Cloud Tank made reasonable efforts to maintain secrecy. *Disruptive Res., LLC v. Ballistic Barrier Prods. Inc.*, 2025 WL 2879447, at \*13-14 (D. Del. Oct. 9, 2025); *compare with* FAC ¶¶16-43, 77-78.

*Second,* Cloud Tank expressly alleges that Cloud Tank's trade secrets include two categories of nonpublic information and that each category has "independent economic value derived, at least in part, from their confidential nature." FAC ¶¶26-27. Cloud Tank then lists five independent sources of value *from the confidential nature of the trade secrets*. *Id.* at ¶27. Intel ignoring how "economic value arises from this confidential information" does not mean the Complaint is deficient. *Compare* D.I. 41 at 16-17 *with* FAC ¶27. Instead, the FAC includes concrete allegations of economic value stemming from **both** the functionality and secrecy of the

17

trade secrets. For example, Cloud Tank alleges that the trade secrets provide it with a "technically superior competitive advantage" (FAC ¶79), in part because ██████████████████████████████████████████████████████████████████████████████ FAC ¶¶19-26. Lastly, Intel also ignores that FAC not only pleads value, but also extensive and "comprehensive security measures," both technical and legal, to preserve secrecy—reinforcing the value derived from not being generally known. FAC ¶¶27, 30-34, 54, 66, 68, 77-79.

Consistent with *Oakwood*, Cloud Tank has plausibly alleged that its vulnerability-identification and vulnerability-mitigation trade secrets were not readily ascertainable by proper means and derived independent economic value from their secrecy. FAC ¶¶5-7, 16-34, 45-69, 76-79; *See Oakwood,* 999 F.3d at 905.

### E. Cloud Tank Sufficiently Pled Breach of Contract.

The FAC sufficiently pleads breach of contract as the ARCA and M-RUNDA are not applicable to and do not grant Intel any ownership or license rights in the asserted trade secrets. *See* III.B, III.C, above. Specifically, (1) the ARCA did not grant Intel authorization to use Cloud Tank's trade secrets, (2) the M-RUNDA's provisions and microcode shared by Intel under the M-RUNDA are wholly separate from the asserted trade secrets, and (3) Intel was not ██████████ ██████ as the asserted trade secrets are not Intel's property under either agreement.

Intel incorrectly argues ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

110701995.14

[BLACK REDACTION] The FAC includes facts making breach plausible, and the Court must draw reasonable inferences in Cloud Tank's favor. *Connelly*, 809 F.3d at 790-91.

Intel assumes [BLACK REDACTION] which represents a fact issue inappropriate for a motion to dismiss. *Jackson*, 2022 WL 610704 at *6; *see also* FAC ¶¶41, 99-101. Lastly, Cloud Tank also alleges [BLACK REDACTION] FAC ¶¶57-60, 70-74, 85-86, 101, 113. Thus, Breach of Contract is sufficiently pled.

### F. Remaining Claims Not Preempted by Delaware's Uniform Trade Secret Act.

#### 1. Delaware Rejects a Label-Based Rule to Displacement.

Delaware rejects a label-based rule to displacement. Instead, the Court must determine whether the common law or non-DTUSA claims are "grounded in the same facts" or "based on the same alleged wrongful conduct" as the trade-secret claim. *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010); *Moon Express, Inc. v. Intuitive Machs., LLC*, No. 16-344-LPS-CJB, 2017 WL 4217335, at *12-13 (D. Del., September 22, 2017). For each of Cloud Tank's claims a close reading of the factual allegations shows differences in the accused conduct: Conversion ("use" versus "distributing copies and derivatives," (FAC ¶109)); Unjust Enrichment

---

[6] Intel's acceptance of Cloud Tank's information [BLACK REDACTION] at minimum created a quasi-contract that Intel breached by disclosing it beyond that limit. FAC ¶¶53-54, 65-66. Additionally, the CNDA requires the receiving party to maintain the confidentiality of the Confidential Information [BLACK REDACTION] *See id.*, *see also id.*, Ex. C, § 3.1.

(development and distribution of patches based on authorized use, capturing commercial opportunities, (FAC ¶109)); and, Tortious Interference (impairing commercial opportunities through distributing unauthorized patches, (FAC ¶¶112-13)). These allegations are not "grounded in the same facts which purportedly support" the DUTSA claim. *See Hemostemix, Inc. v. Accudata Sols.*, No. 20-881-RGA, 2021 WL 1198137, at *4-5 (D. Del. March 30, 2021). (FAC. ¶¶24, 55, 112); *Panacea Fin. v. Tallied Techs., Inc.*, 2025 U.S. Dist. LEXIS 188269, at *7 (N.D. Cal. Sept. 24, 2025) (analyzing preemption under DUTSA).

### 2. Ruling on Displacement is Premature at the Pleadings Stage.

Additionally, dismissal for DUTSA displacement is premature and unwarranted at the pleading stage. *See Accenture Glob. Servs. GmbH v. Guidewire Software, Inc.*, 631 F.Supp.2d 504, 508 (D. Del. 2009) (explaining whether a claim is grounded in the same facts as a DUTSA claim "often cannot be determined" on motion to dismiss); *see also Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp.2d 426, 434-345 (Del. Del. 2005) (holding a tortious interference claim could proceed because it might be provable without proving trade-secret misappropriation after discovery); *OverDrive, Inc. v. Baker & Taylor, Inc.*, No. 5835-CC, 2011 WL 2448209, at *5 (Del. Ch., June 17, 2011) (deferring question of preemption "until the facts are sufficiently developed and become clear after discovery, further briefing or trial.").

## VI.    CONCLUSION

For all the reasons set forth above, Intel's motion to dismiss should be denied.

110701995.14

POLSINELLI PC

OF COUNSEL:

Jonathan R. Spivey (*pro hac vice*)
Aaron M. Levine (*pro hac vice*)
Matt Todd (*pro hac vice*)
POLSINELLI PC
1000 Louisiana St, Suite 6400
Houston, TX 77002
Tel: (713) 374-1600
jspivey@polsinelli.com
alevine@polsinelli.com
mtodd@polsinelli.com

April 27, 2026

*/s/ Stephen J. Kraftschik*
Stephen J. Kraftschik (#5623)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Tel: (302) 252-0920
skraftschik@polsinelli.com

*Attorneys for Plaintiff Cloud Tank, Inc.*

110701995.14